1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3    UNITED STATES OF AMERICA          :

4              v.                      :   CRIMINAL NO. 1:CR-01-107

5    BRUCE P. WARD,                    :
               Defendant
6

7

8

9                    TRANSCRIPT OF PROCEEDINGS

10               REVOCATION OF RELEASE HEARING

11        Before:  Hon. William W. Caldwell, Senior Judge

12        Date:    August 20, 2001

13        Place:   Courtroom No. 1                **FILED**
                   Federal Building          **HARRISBURG, PA**
14                 Harrisburg, Pa.
                                             DEC **2 3** 2004

15
                                        **MARY E. D'ANDREA, CLERK**
16                                      Per

17   COUNSEL PRESENT:

18       DENNIS C. PFANNENSCHMIDT, Assistant U.S. Attorney

19           For - Government

20       THOMAS A. THORNTON, Esquire

21           For - Defendant

22

23

24
                                        Monica L. Zamiska, RPR
25                                      Official Court Reporter

1          MR. PFANNENSCHMIDT:  Your Honor, this is the matter

2     of the United States v. Bruce Ward.  It is captioned at

3     1:CR-01-107.  Mr. Ward is present today on the basis of an

4     order issued by the Court on August 10 on a petition for

5     revocation of release, and the Court scheduled today at this

6     time for a hearing on why the bail should not be revoked.

7          THE COURT:  Okay.

8          MR. THORNTON:  Your Honor, if I could, this hearing

9     has been scheduled basically at my request.  Mr. Ward has

10    been under the pretrial supervision of Mr. Buckwalter since

11    his initial appearance in this matter in April.  During that

12    time the probation office set Mr. Ward up for evaluations at

13    Ponessa & Associates and also at the Holy Spirit Hospital.

14    The evaluation at Ponessa has been completed, and the

15    probation office is now seeking to have Mr. Ward undergo

16    treatment at Ponessa & Associates.  He still has the

17    evaluation at Holy Spirit Hospital to undergo.  He was

18    supposed to be there on Friday of this week but unfortunately

19    -- or Friday of last week, but unfortunately he was starting

20    a job that day and so had to reschedule that appointment.

21          Your Honor, at this point we are here because I

22    have instructed Mr. Ward that the pretrial release order does

23    not require him to undergo the type of therapeutic

24    supervision which the probation office is planning to impose

25    upon him, including things such as a therapeutic polygraph

1    which is undertaken by Ponessa & Associates, and I personally

2    think the term therapeutic polygraph is probably an oxymoron.

3    I don't believe the two things can possibly go together.

4        And then, secondly, it's my understanding that

5    there is a possibility that a plethysmograph, which is

6    p-l-e-t-h-y-s-m-o-g-r-a-p-h, that a plethysmograph may be

7    used during this treatment.  A plethysmograph device is like

8    a blood -- from my understanding is like a blood pressure

9    collar that is applied to an individual's penis, and then the

10   individual is shown movies and audiotapes of non-consensual

11   and violent sexual interaction in order to engage what blood

12   flow differences occur in the person's penis during that

13   showing of the movies.  We do not feel that Mr. Ward should

14   be required to undergo any of this type of therapy, if it's

15   therapy, any of these things as a result of his pretrial

16   supervision.

17       He's done nothing since the time of his arrest to

18   indicate that there has been any further conduct, any further

19   conduct that is similar to the conduct in these charges.

20   There has been no accessing of the internet for child

21   pornography purposes, and on top of that the charges

22   themselves don't involve actual contact with any human being.

23   They involve downloading things from the internet.  So there

24   is no indication here that Mr. Ward has ever abused another

25   person or attempted to abuse a child in any way.

1          Consequently we believe that the decision by the

2     probation office to require Mr. Ward -- to force Mr. Ward to

3     undergo therapy and whatever else Ponessa & Associates decide

4     is appropriate for them is not necessary in the pretrial

5     release order that Your Honor has set out and not necessary

6     for Mr. Ward and is probably unconstitutional because it

7     requires Mr. Ward to divulge confidences to a therapist who

8     does not have a patient/therapist relationship with him but

9     who reports directly to the probation officer, and the

10    information that he provides goes directly into the

11    presentence report.

12         So he's in a situation where if he doesn't talk, he

13    goes there and doesn't participate, they deny him acceptance

14    of responsibility.  If he goes there and talks and tells the

15    truth, they put it in the presentence report and his sentence

16    is increased either in the guidelines or possibly even

17    outside the guidelines.

18         And, even further, there is the distinct

19    possibility there is some other type of uncharged criminal

20    conduct that may come up during these forced therapy

21    sessions.

22         Consequently we ask Your Honor to not revoke Mr.

23    Ward's release for two reasons.  First of all, this is

24    basically my objection, and the reason for my objection is we

25    have these cases coming up fairly regularly now, and the

1    probation office is using Ponessa & Associates on a regular

2    basis to do these interviews and suggest this therapy.  Mr.

3    Ward's case seems to be the first one that is appropriate to

4    bring to Your Honor's attention the fact that this therapy

5    with the plethysmograph and group therapy and all the other

6    things is really not or should not be part of a pretrial

7    order of release, and consequently we'd ask Your Honor not to

8    revoke Mr. Ward's release because he will do whatever the

9    Court orders here, and we wish to interpose an objection to

10   the probation office requiring this kind of treatment of a

11   person who is about to go to jail for a couple of years.

12            THE COURT:  Okay.  Mr. Pfannenschmidt.

13            MR. PFANNENSCHMIDT:  Well, Your Honor, I guess a

14   couple points.  One is I think it's important here to

15   recognize what the issue is before the Court and the status

16   of the case as it stands.  Mr. Ward has pled guilty to an

17   offense that involves obtaining child pornography.  So that's

18   the situation that he's in.

19            The probation office, as they always do in these

20   cases, require an evaluation.  He received that evaluation by

21   a professional.  The probation office has made a

22   determination that he needs to undergo treatment.  They have

23   now indicated that should be the recommended course of

24   treatment, the probation office agreed with that, and

25   pursuant to the conditions of release they have directed that

1    he comply with the conditions of release as they are stated,

2    which, as I read it, satisfactorily participate in mental

3    health and/or substance abuse evaluation, testing and/or

4    treatment as directed by pretrial services.  There is no

5    exception to that.  It clearly says this is what he's

6    required to do as a condition of release.  Now he's refused

7    to do that.  I think that's the issue.

8        Since he's refused, I think the Court has Section

9    3148 of Title 18 indicates that a person who violates a

10   condition of his release is subject to a revocation of

11   release and ordered detention and even prosecution for

12   contempt of court.  So I think it's a very simple

13   straightforward matter.

14       THE COURT:  This is the first time that any

15   evaluation of the type described by Mr. Thornton has been

16   objected to or brought to my attention.  Are there other

17   people under the supervision of pretrial services who are

18   made to do these very things?

19       MR. PFANNENSCHMIDT:  I'm not sure I could answer

20   that.  Maybe probation could answer that.

21       MR. BUCKWALTER:  Yes, Your Honor, there have been.

22       THE COURT:  Do you meet resistance or objection?

23       MR. BUCKWALTER:  Not that I'm aware of, Your Honor.

24       MR. THORNTON:  If I can interrupt, I know I had one

25   previous case where this was done to my client.  I don't know

1    if there were any other previous cases other than Thomas

2    Davis.  Is that the only one?  Is there any other one that

3    it's been done to?

4              MR. BUCKWALTER:  I can't think of any, but that is

5    one.

6              MR. THORNTON:  Your Honor, the previous case that I

7    had where we did not make this objection because of the

8    specific facts of that case.  In this case this objection

9    seemed much more appropriate where they require Mr. Ward to

10   undergo extreme therapy which does not have any basis in

11   science or fact, and consequently it's unreasonable to

12   require him to undergo any therapy which the probation office

13   thinks is appropriate.  There must be some basis in science

14   or fact for this plethysmograph.  It isn't even admissible in

15   court.  It cannot pass the challenge from numerous cases in

16   federal courts and state courts.  Consequently it doesn't

17   seem that Mr. Ward should be able to undergo that type of,

18   quotation marks, treatment.

19             Particularly the therapeutic polygraph just seems

20   very inappropriate and impossible to work correctly unless --

21             THE COURT:  What is a therapeutic polygraph, does

22   anybody know?

23             MR. PFANNENSCHMIDT:  Your Honor, generally speaking

24   if I can answer that, I had spoken to Cam Richesson,

25   R-i-c-h-e-s-s-o-n, who is here in the courtroom, and I think

1    she can answer more particularly, but in my conversations

2    with her, it is my understanding that anything like this is

3    for treatment purposes only, and I'm not aware of the second

4    matter that Mr. Thornton raised, I never heard of that, but

5    regardless of that, I think he made some comments about this

6    being extreme therapy, and I think that's without basis.  My

7    understanding from her is that this is routine therapy.

8         THE COURT:  Well, if I understand Mr. Thornton

9    correctly, there are two examinations or therapies that you

10   object to?

11        MR. THORNTON:  Yes, Your Honor, the therapeutic

12   polygraph --

13        THE COURT:  Okay.

14        MR. THORNTON:  -- and the plethysmograph,

15   p-l-e-t-h-y-s-m-o-g-r-a-p-h.

16        And, Your Honor, just as a further point to what

17   Mr. Pfannenschmidt said, we wouldn't have a difficulty with

18   these therapies, these requirements, if it weren't reported

19   directly to the Court, so that anything that Mr. Ward says,

20   he might as well be speaking directly to Your Honor because

21   there is no patient/therapist privilege.  There is -- I mean,

22   his incentive to not tell the truth, even though if you read

23   -- eventually Your Honor will probably see the Ponessa

24   evaluation, you will see that he certainly didn't tell the

25   truth, but his reasons for not telling the truth are just

1    extremely great.  If everything that he says is going to be

2    reported in the presentence report, then he will either

3    increase his guideline range or will cause Your Honor to look

4    at him and say, "Oh, I'm going to give him a sentence at the

5    high end of the guideline range because of what he said in

6    therapy."  We run into a terrible situation because now Mr.

7    Ward, if he goes to the therapy and feels chilled by the fact

8    that anything that he says is coming straight back here to

9    court, then the people at Ponessa & Associates are going to

10   say he's not complying, he doesn't want to do it, he's

11   dragging his feet, and consequently they may recommend that

12   he doesn't get acceptance of responsibility points for not

13   complying with the treatment.  Mr. Ward is just put in a very

14   bad situation which could be remedied by Ponessa & Associates

15   not divulging the information that he gives them during

16   therapy to the Court.

17            I understand that the initial evaluation process

18   most likely has to be divulged to the Court, but it seems

19   that the therapy that is undertaken after the evaluation does

20   not necessarily need to be divulged to the Court, and

21   actually it's working for cross purposes if it is.

22            THE COURT:  Has there been the evaluation?

23            MR. THORNTON:  Yes.

24            THE COURT:  There has been?

25            MR. THORNTON:  Yes, Your Honor.

1          THE COURT:  I think Mr. Thornton has a point there.

2          MR. PFANNENSCHMIDT:  Well, Your Honor, I think

3     that, if I can reply to that, my understanding of this is

4     this is supposed to be treatment, and that's what's going on

5     here.  I think it's -- there is a number of scenarios Mr.

6     Thornton has outlined, and I think it's highly unlikely at

7     best.  The idea here, these therapists are not there to try

8     to obtain information from this individual so the Court can

9     then use it to enhance his guidelines.

10          I'm not aware of any basis under which Mr. Ward --

11     my discussions with Mr. Thornton about Mr. Ward's situation,

12     I'm not aware of any information that he has that could have

13     enhanced the guideline here.  I'm familiar with this

14     guideline.  I don't see what he could say that could possibly

15     change the guidelines.  So I think that is --

16          THE COURT:  I guess he could say something that

17     would cause me to believe that he ought to be sentenced at

18     the high rather than the low end of the range.

19          MR. PFANNENSCHMIDT:  But I think it's incorrect to

20     assume that we're taking specific things that he says.  The

21     way this therapy works, as I understand it, is there is a

22     group therapy, and it's a discussion among individuals.  It's

23     not a therapist sitting there taking down what he says and

24     then reporting it to the Court.  There is a process that goes

25     on, and their report to the Court is more in terms of the

1    result of that process rather than the process itself.  I

2    think under that situation there is very little likelihood

3    that anything he in particular says about a specific

4    situation could lead to that.

5         There is also the fact that the Court needs to have

6    a picture of this individual in order to make a

7    determination of where the sentence should be anyway.  So

8    some of that information is proper before the Court.  I'm not

9    quite clear exactly what counsel's objection is.  I think

10   he's claiming some kind of self-incrimination objection, but

11   there is no indication in this process that he's going to

12   incriminate himself, so I'm kind of at a loss to understand

13   what exactly the objection is here.

14        MR. THORNTON:  Well, it's sort of two parts, Your

15   Honor.  The fifth amendment requires some compulsion of Mr.

16   Ward's being compelled at this point to give evidence against

17   himself.  If he were to say something, it could be used

18   against him, and if he were to admit to some other criminal

19   activity, the therapist may be under a duty under

20   Pennsylvania law to report that criminal activity, and

21   consequently he could be in even a worse position.

22        The Kansas courts have dealt with this and have

23   granted immunity, and obviously it's not something that's

24   been done in the federal courts on a regular court-wide

25   basis, but they granted immunity for all the therapy so that

1    there is no possibility that anything that's said during

2    therapy can be used in any way in any proceeding against the

3    individual.  That's sort of a halfway step or a way in

4    between.

5            As I said at the beginning of the hearing, Mr. Ward

6    is fully ready to comply with whatever order Your Honor

7    issues.

8            THE COURT:  Mr. Pfannenschmidt, would you be able

9    to agree that anything that is revealed in the course of this

10   therapy would not be the basis for another criminal charge or

11   a basis for setting the guidelines?  I think that's --

12           MR. PFANNENSCHMIDT:  Well, Your Honor, in this

13   specific case I don't think that's a problem.  I do have a

14   problem with that though in the general sense because again I

15   think there it's important to look at the context here, he's

16   refused to participate in this treatment, he can do that, but

17   then the Court has a duty or certainly an obligation to

18   consider revocation of his release.  That's the thing here.

19   I mean, he's trying to set conditions under which he will

20   comply with the order that this Court has already imposed

21   upon him.

22           THE COURT:  I think the only thing he's asking is

23   that whatever comes out of the therapy not be used against

24   him to either enhance the sentencing range or to be the basis

25   for further charges.

1              MR. PFANNENSCHMIDT:  Well, that's not what I

2    understood the original objection to be, but I guess that's

3    where we are now.  The original objection did not deal with

4    it at all.  Now we're talking about, "Well, do it with

5    conditions."  That's certainly something the Court can direct

6    if the Court wishes to do so in this particular case.

7              But I guess I would have some concerns about this

8    since there has been no briefing on this.  I have some

9    concerns about setting this precedent.

10              THE COURT:  Well, I don't want to set a precedent.

11    I'm trying to deal with this one case here this afternoon, --

12              MR. PFANNENSCHMIDT:  I understand.

13              THE COURT:  -- and it seems to me a reasonable

14    solution would be that Mr. Ward engage in the therapy or

15    whatever he would term it, but that any information revealed

16    in the course of the relationship would not affect the

17    guideline or be a basis for further criminal charges.  Is

18    that what you're asking?

19              MR. THORNTON:  Yes, Your Honor, and I'm also asking

20    that he not be subjected to either the plethysmograph, which

21    seems to be incredibly invasive, or the therapeutic

22    polygraph.

23              THE COURT:  I guess I'd like to know a little bit

24    more about these two examinations.  I don't have enough

25    information to know whether you're correct or not.

1    MR. PFANNENSCHMIDT:  Your Honor, I can ask Miss

2    Richesson to take the stand.

3    THE COURT:  Fine, that would be good.

4    CAMILLA RICHESSON, called as a witness, being duly

5    sworn or affirmed, testified as follows:

6    THE CLERK:  Please be seated, ma'am.  Would you

7    state for the record your full name please.

8    THE WITNESS:  Camilla Richesson.

9    THE CLERK:  Could you spell your first and last

10   name please.

11   THE WITNESS:  C-a-m-i-l-l-a R-i-c-h-e-s-s-o-n.

12   THE CLERK:  Thank you.

13                   DIRECT EXAMINATION

14   BY MR. PFANNENSCHMIDT:

15   Q    Ma'am, what's your occupation?

16   A    I am a certified sexual predator specialist with T. W.

17   Ponessa & Associates.

18   THE COURT:  What's the name of the associates

19   again?

20   THE WITNESS:  T. W. Ponessa, P-o-n-e-s-s-a.

21   BY MR. PFANNENSCHMIDT:

22   Q    And is it the business of your firm to design and carry

23   out evaluations and treatment programs for sexual offenders?

24   A    Yes.

25   Q    And in this particular case have you done an evaluation

1   of Mr. Ward?

2   A    I have.

3   Q    Okay, and you don't need to discuss the details of

4   that.  Based upon that evaluation did you make a

5   recommendation to the probation office?

6   A    I did.

7   Q    What was that?

8   A    Gosh, I left it back on my things.

9   Q    Just a summary, that he needs further treatment?

10  A    Yes, sexual offender treatment and I also recommended

11  drug and alcohol evaluation and a psychiatric evaluation.

12  Q    Now let's talk about the sexual offender treatment.

13  A    Yes.

14  Q    Do you have either a treatment plan or some -- can you

15  outline to the Court what this treatment would involve?

16  A    Well, first of all, we don't utilize the

17  plethysmograph.  We do utilize the polygraph, and I will talk

18  about that.

19       Basically we have a group treatment modality.  It's an

20  eclectic approach.  It takes pieces from various therapeutic

21  regimens, as such cognitive behavior, which is the one we

22  utilize the most.  Obviously we do some group work gestalt

23  just focusing on feeling and affect.

24       The reason that we use the polygraph -- first of all,

25  let me address the group.  The reason that we use group is

1     that it's recognized as worldwide at this point as the

2     standard of treatment for sexual offenders, and that is

3     recognized by ATSA, A-T-S-A, and that is the Association for

4     the Treatment of Sexual Abusers.  They are the authorities

5     so-to-speak of sexual offender treatment.

6          Group therapy enables an individual to come into an

7     environment, of course, starting is a difficult thing for

8     most people because it's nerve-wracking to try to get to know

9     people, but once they're there, what happens is that the

10    group can affirm positive behaviors, thinkings, feelings, it

11    can also confront issues like denial or behaviors that are

12    risky or thinking that is distorted.  It's very effective

13    treatment.

14         As far as terms of a polygraph goes, in this case I

15    recommended that we would possibly use a therapeutic

16    polygraph with Mr. Ward, and that would be to address the

17    issue of what I see as the potential for denial on his part,

18    not denying that he owned or possessed child pornography,

19    that part he admitted to, but the reason that he gave me for

20    such a large collection was that, first of all, he heard some

21    newscasters on TV talking about how easy it was to access

22    child pornography and decided to see how easy it was for

23    himself.  Once he was able to do that, he decided that he was

24    going to access web sites and turn them in to the federal

25    government to make money but he just never got around to

1   doing that.

2       One of the reasons that we would use a polygraph is to

3   determine the intent.  I believe that there was sexual intent

4   from Mr. Ward in accessing the child pornography, and that

5   would be one of the reasons we would need to find out.

6       THE COURT:  Excuse me for interrupting you but the

7   purpose of the polygraph would be to enable you to say,

8   "Well, I don't think you're telling the truth"?

9       THE WITNESS:  Correct, in this instance it would be

10  used for denial.

11      THE COURT:  You already don't think he's telling

12  the truth?

13      THE WITNESS:  From what I heard him say that is

14  accurate, sir.

15      THE COURT:  All right, go ahead.

16  BY MR. PFANNENSCHMIDT:

17  Q   Complete your answer.

18  A   Basically then what we would look at from him, we are

19  not looking at getting details of Mr. Ward's disclosure back

20  to anybody, we would be looking at whether or not he's

21  complying satisfactorily with treatment.  The entire first

22  treatment goal for our practice is no more victims.  We want

23  to make sure while there is no tangible victim in front of

24  me, there sure are victims in this case, there had to be in

25  order for the pictures to have been taken, and that is

1    something that we would want to explore and help Mr. Ward

2    understand and to make sure because, as I'm aware of in this

3    area, that pornography use is often a precursor to other

4    behaviors.  It's an escalative-type of behavior, and we want

5    to try to stop that before it goes there, if that was indeed

6    where it was going.  I can't make guarantees one way or the

7    other, but I certainly want to make sure that no one else

8    gets hurt.

9            THE COURT:  You're saying you're not going to get

10   involved in this plethysmograph?

11           THE WITNESS:  We don't use that, sir.

12           THE COURT:  Mr. Thornton, did you hear that?

13           MR. THORNTON:  Yes.

14           THE COURT:  Do you have any questions?

15           MR. THORNTON:  Yes, sir.

16                         CROSS EXAMINATION

17   BY MR. THORNTON:

18   Q    Miss Richesson, how long does this treatment program

19   usually last if you want to take it to fruition and actually

20   help someone not to reoffend?

21   A    Okay, at this particular time there is no set end

22   guidelines, and that is because it in large part depends on

23   the client's motivation.  We have several treatment goals

24   that we expect each person to undergo before they're able to

25   be released.  We have people that have done that, but it's

1    taken them a few years in order to do that.  We have groups

2    that meet once per week for one hour.  So you're talking

3    total therapeutic time of, well, you usually have a vacation

4    or two in there, you're talking about maybe 50 hours of

5    therapy a year, and that's really just starting to nip the

6    bud.  But it depends on his motivation, you know.

7    Q    So somebody who's going to jail for a couple years, in

8    probably about four weeks Bruce is going to be in jail for a

9    couple years with hardened criminals, in about four weeks you

10   couldn't get anything done in those four weeks, could you?

11   A    Oh, we sure could.

12   Q    You have one session a week, and one of those sessions

13   is going to be a polygraph where you accuse him of lying.

14   Right?

15   A    Well, we're going to find out whether or not that's the

16   case.  I'm not accusing anyone at this point.

17   Q    Okay, well, let's say the polygraph comes up and

18   whoever you have doing the polygraph decides that this is a

19   deceptive answer.  Then you go after him and say, "Bruce, you

20   are lying.  Tell us the truth.  Bruce, you're lying.  Tell us

21   the truth."  Is that basically what you are doing there?

22   A    Well, I suppose you could term it that way, but

23   actually, no, we don't really tell people that they are lying

24   or anything like that, it's definitely not as complicated as

25   you make it seem.  What we are trying to do is get in touch

1   with the person's intent.  If he has a sexual intent in

2   drawing child pornography off the internet, okay, for

3   purposes of sexual gratification, that is a preindicator to

4   us.

5   Q     Didn't he tell you that one of the reasons he did it

6   was for sexual gratification?  You said that he did it

7   initially because he wanted to access the web sites to see

8   how easy it was.

9   A     No, sir.

10  Q     Well, we can deal with that at the sentencing.

11        Now you indicated that you said you don't intend to

12  give details to anyone, but when Mr. Buckwalter calls you and

13  asks you questions, you're going to tell him everything,

14  aren't you?  I mean, you're going to tell him Bruce Ward told

15  you that he's been fantasizing every night for the last two

16  weeks about the little girl down the street.  If he says that

17  in group two weeks in a row, you're going to tell Mr.

18  Buckwalter that, aren't you?

19  A     That would depend, sir, on Mr. Ward's level of

20  commitment to reducing the fantasies and the behavior.

21  Q     Why would that matter?  I mean, so that you make the

22  decision on your own as to what to tell Mr. Buckwalter, you

23  don't tell him everything he asks you?

24  A     No, no, no, not necessarily.  What I'm saying is if Mr.

25  Ward was admitting to fantasies but he was taking an active

1   approach in reducing the sexual fantasies or masturbation

2   activity, that would say a whole lot to me about his

3   motivation to change his behavior.

4   Q    Okay, now how would he show you -- let's say he's going

5   to be in jail in four weeks, how would he show you in those

6   couple weeks that he's changed his behavior so that you

7   wouldn't feel it was necessary to tell Mr. Buckwalter these

8   things?

9   A    I can't answer that question.

10  Q    Now you indicated that -- well, you indicated that you

11  have an eclectic treatment program.

12  A    Right.

13  Q    Who put this treatment program together?

14  A    Who put it together?

15  Q    Yeah.

16  A    Gosh, I guess about 10 years ago my owner -- the owner,

17  Tom Ponessa, put it together with a man by the name of Robert

18  Gingrich.

19  Q    Have you ever had any peer reviews of this?  Has

20  anybody come by and reviewed your treatment program, somebody

21  from an overall organization?

22  A    Yeah, absolutely.  As a matter of fact, we have regular

23  contact with the Megan's Board assessment people.  We --

24  Q    I'm sorry, not contacts, has anybody been reviewing

25  you, testing your program?

1    A     Are they looking at our procedures, absolutely.

2    Megan's Board is doing that.

3    Q     In what way?  Do they give you --

4              THE WITNESS:  Megan's Board, sir.

5              THE COURT:  I don't know who they are.

6              THE WITNESS:  They are the governing body for the

7    Pennsylvania state in determining assessment of sexual

8    offenders, whether or not they're predators or not.  It's an

9    assessment board that is going to make the determination

10   about the appropriate treatment practices in Pennsylvania.

11             THE COURT:  Okay.

12             THE WITNESS:  They are under the Pennsylvania State

13   Parole Board I believe.

14   BY MR. THORNTON:

15   Q     Is that something that came about as a result of

16   Megan's Law?  Is that what this Megan's Board is?

17   A     No.  You mean our treatment program?

18   Q     No, no, Megan's Board that you say is used at Ponessa &

19   Associates.

20   A     Right.

21   Q     Did that come about as a result of Megan's Law, the law

22   where you have to report sexual offenders?

23   A     Yes, as far as I know.

24   Q     So that this board itself is only determining whether

25   you are fulfilling their reporting requirements, right, they

1    are not judging your treatment program?

2    A    Absolutely they are judging our treatment program.

3    Q    Where are the results of that reported?  Do they give

4    you some piece of paper that says you're doing this right,

5    you're doing this wrong?

6    A    You'd have to ask them, sir, I don't know.

7    Q    What interaction do you ever have with these people you

8    say that oversee the treatment program or review the

9    treatment program?

10    A    I have personal contact with the director of Megan's

11    Board.

12    Q    For what purpose?  What exchanges do you have?  Does

13    she say --

14    A    Talking about our treatment program, what we do, what

15    we offer, showing her what she needs to see.

16    Q    But you have never received any -- have no knowledge of

17    any actual evaluation that's been done?

18    A    Not written.

19    Q    And what -- if it's not written, how does the oral

20    evaluation process go?

21    A    How does it go?

22    Q    What do they come and tell you you need to do these

23    things but we're not writing it down?

24    A    If she has a problem with something that we are doing,

25    she would tell us, but so far there hasn't been a problem.

1    Q    Now the therapeutic polygraph, you told us -- let me

2    ask the question, when would the therapeutic polygraph be set

3    up?  Bruce is going to jail probably in four weeks.  When

4    would you do that?

5    A    That would depend on whether or not payment would be

6    approved and received prior to that.  Could be as soon as

7    next week.

8    Q    And Bruce has to pay for all this himself.  Right?

9    A    That's not my understanding, no.

10          MR. THORNTON:  I would ask Mr. Buckwalter is Mr.

11    Ward paying for this himself?

12          MR. BUCKWALTER:  No.

13          MR. THORNTON:  It was Mr. Ward's understanding that

14    he was going to have to pay for this himself.

15          MR. BUCKWALTER:  No.

16    BY MR. THORNTON:

17    Q    Finally my last question is what is your training and

18    background?  Where did you go to school?

19    A    I graduated from Millersville University with a master

20    of science degree in clinical psychology.  I received my

21    certification in sexual predator treatment specialist from

22    Ohio University, and I have been doing this for four years.

23    And in addition to those trainings, golly, I know it's over

24    250 hours of sexual predator specialized treatment training,

25    some offered by ATSA, some offered by local organizations who

1    also provide treatment.

2    Q    You mentioned ATSA, what's that?

3    A    ATSA, A-T-S-A, --

4    Q    ATSA.

5    A    -- Association for the Treatment of Sexual Abusers.

6    Q    And where are they located?

7    A    I'm not sure where their main office is. They have

8    offices all over the place. They have one in Canada. They

9    have one in the United States. They have one in the United

10   Kingdom.

11   Q    And the training for them, was it specified training in

12   certain areas or are you just meeting with them to discuss

13   issues?

14   A    No, it's conferences.

15   Q    Is there any type of accreditation in your field

16   whatsoever?

17   A    In my personal field, no, but there are some on our

18   staff who have that.

19   Q    What accreditation would that be?

20   A    Well, we have someone on our staff who is a licensed

21   psychologist. He would get -- it depends on your training

22   and your degree. We have someone else on our staff who is an

23   NCC board certified counselor. She would get accreditation

24   because of the type of thing she holds. But they don't offer

25   it to everybody. They offer you the fact that you have been

26

1      there and have the hours but --

2      Q     Do you have a psychiatrist James Arndt on your staff?

3      A     We sure do.

4      Q     And is that a psychiatrist who can prescribe medication

5      or a psychiatrist who actually works in the building?

6      A     He works with us.

7      Q     In the building with you?

8      A     Well, we have five different offices, and he works out

9      of one of them.  Most of our clients who are referred to him

10     go to that office.

11           THE COURT:  What is his name?

12           THE WITNESS:  Dr. James Arndt, A-r-n-d-t.

13     BY MR. THORNTON:

14     Q     And I assume Dr. Arndt has never seen Mr. Ward.  Right?

15     A     Not to my knowledge.

16     Q     Does Dr. Arndt review your summaries or your

17     evaluations?

18     A     He did not review this one, my program coordinator did.

19           MR. THORNTON:  Thank you.  We have no further

20     questions, Your Honor.

21           THE COURT:  Any further questions?

22           MR. PFANNENSCHMIDT:  No.

23           THE COURT:  Miss Richesson, assuming that Mr. Ward

24     takes the polygraph, you call it a therapeutic polygraph but

25     it's a polygraph, --

1          THE WITNESS:  It's a polygraph, yes, sir.

2          THE COURT:  -- how much of that comes back to the

3     pretrial services people or is that just something you use?

4          THE WITNESS:  Mostly we utilize it for treatment,

5     that is the purpose.  We need to find out the truth about the

6     matter, and it's been very successfully used in our practice

7     for years.

8          THE COURT:  But you don't necessarily just report

9     everything, every question, every answer and so forth?

10         THE WITNESS:  No, sir, not unless that's requested

11    by the probation officer.

12         THE COURT:  Okay, thank you.

13         MR. THORNTON:  If I can ask one further question.

14    BY MR. THORNTON:

15    Q     And basically anything that Mr. Buckwalter or Mr. Pool

16    asks you you are going to answer.  Right?  If they ask you,

17    "Did Bruce Ward tell you that he accessed those web sites

18    only to perhaps turn them over to the federal government?

19    Did he tell you that when he took the polygraph?  Did he fail

20    that question?"  You know they're going to ask you that,

21    right, and you're going to have to answer them?  Right?

22    A     Right.

23    Q     And if they ask, "Did Bruce Ward make any incriminating

24    remarks during group therapy?", what are you going to say?

25    If they ask you, let's make it specific, if they ask you,

1    "Did Bruce Ward ever indicate during any of the group

2    therapies that he had active fantasies involving children?",

3    are you going to answer that question?

4    A    Sure.

5    Q    And tell them the truth, so that if he said yes during

6    any of those therapy sessions or indicated to you, you would

7    be divulging his therapeutic confidences to you to the

8    probation officer?

9    A    Therapeutic confidence with our practice is limited, I

10    will tell you that.  It needs to be based on the standard of

11    treatment for sexual offenders.  Everybody needs to be on the

12    same page, sir.  The probation office, the polygraph examiner

13    and the treatment providers all need to have the same

14    information.  Again it's not for the purposes of following

15    and tracking someone legally and criminally and trying to

16    hunt them down, it's for the purposes of not creating any

17    more victims.  And once someone becomes invested in the

18    program and they see what it's all about, it becomes pretty

19    clear that that's not what we're all about.  We're about

20    treatment for the individual.  If he's got some deviate

21    sexual behavior and something we want to deal with, we want

22    to address that so that it stops or it's greatly minimized

23    and that the future harm of any individual will not happen.

24    That is the goal.

25    Q    Well, of course, you see that that goal would work with

1    cross purposes for someone who is being sentenced.  Right?

2    A    I personally do not see how that could be in this case.

3            MR. THORNTON:  Thank you.

4            THE COURT:  Thank you very much.  Appreciate your

5    being here.

6            THE WITNESS:  Sure.

7            MR. THORNTON:  Your Honor, our initial objection

8    was regarding the plethysmograph and the therapeutic

9    polygraph.  We still -- and since they have indicated they

10   will not use the plethysmograph, that was brought up to me in

11   conversation with someone somewhere, and I was under the

12   impression that they would, so we would not continue that

13   objection obviously.  Still we would ask that he not be

14   subjected to the therapeutic polygraph, and that any

15   confidences or anything that comes out of Mr. Ward, any

16   statement that he makes, not be used against him in any way

17   in any further proceeding here.

18           THE COURT:  Okay.  I understand, Mr. Thornton, what

19   your argument is.  The other side of the coin is that the

20   treatment that has been directed by the pretrial services is

21   designed not to get Mr. Ward in further trouble but to help

22   him as much as possible.

23           I don't want to establish any precedent about this,

24   and what I'm concluding applies just to this case, but I'm

25   going to direct that he does participate in the polygraph as

1    part of the treatment, but I can assure you, Mr. Thornton and

2    Mr. Ward, that I will not permit anything that might get back

3    that is of a negative nature to influence my judgment and

4    decision as far as the sentence is concerned.  On that basis

5    we will continue Mr. Ward under the supervision of pretrial

6    services.  We will not revoke his release.  Okay.

7                (The proceedings concluded.)

8

9                I hereby certify that the proceedings and evidence

10   of the court are contained fully and accurately in the notes

11   taken by me on the revocation of release hearing of the

12   within cause, and that this is a correct transcript of the

13   same.

14

15   _Monica L. Zamiska_

16                    Monica L. Zamiska, RPR

17                    Official Court Reporter

18

19

20

21

22

23

24

25